UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
**CHIN KUO**,

                            Plaintiff,        **MEMORANDUM & ORDER**
            - against -                 on Defendant's Motion for Partial
                                                           Summary Judgment (doc. #17)
                                                           **05-cv-3295** (DRH) (JO)

**COMPUTER ASSOCIATES
INTERNATIONAL, INC.**,

                            Defendant.
---------------------------------X

**APPEARANCES:**

*For the Plaintiff*:

VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.

1501 Broadway, Suite 800

New York, NY 10036

    **By:**    **Kevin T. Mintzer, Esq.**

               **Daniela E. Nanau, Esq.**


*For the Defendants*:

FARRELL FRITZ, P.C.

1320 Reckson Plaza

Uniondale, NY 11556

    **By:**    **John P. McEntee, Esq.**

               **David A. Scheffel, Esq.**

               **Gabrielle R. Schaich, Esq.**


**HURLEY, Senior District Judge:**

      This case arises from Plaintiff Chin Kuo ("Plaintiff" or "Kuo") having taken leave under

the Family Medical Leave Act ("FMLA"). Upon his return from leave, Kuo asserts he was

given a lesser position than he previously held before his leave and that, because he was placed in this lesser position, he was subsequently laid off. Defendant Computer Associates International, Inc., Kuo's former employer ("Defendant", "CA", or the "Company"), asserts that it was Kuo who asked to be moved to a new–albeit "lesser"–position upon his return from leave. In any event, the Company maintains that Kuo's subsequent lay-off was a mutually exclusive event to his FMLA leave; because of budget constraints, a decision was made to lay off employees in Kuo's group, including Kuo.

Defendant now moves for partial summary judgment on Plaintiff's claim that the Company terminated Kuo in retaliation for his having exercised his rights under the FMLA.[1]

---

[1] The Plaintiff's sole "Claim for Relief" is the Company's alleged violation of the FMLA. (*See* Compl. ¶ 25, attached as Ex. A. to Def.'s Not. of Mot. Partial Summ. J.) Specifically, Plaintiff states:

> 25. By the acts and practices described herein, defendant has interfered with, restrained, and denied plaintiff, and retaliated against him for exercising, his rights under the FMLA, in violation of the FMLA, 29 U.S.C. §§ 2612(a), 2614(a)(1) and 2615(a)(1).

(*Id.*)
    According to CA, "Kuo asserts one claim under the FMLA based upon two theories: (1) that CA terminated him because he had taken paternity leave ('Termination Claim'): and (2) that CA did not restore him to an equivalent position upon his return from leave ('Restoration Claim')." (Def.'s Mem. Supp. Mot. Partial Summ. J. at 1.) It notes that it is not moving to dismiss the so-called "Restoration Claim", which it characterizes as "*de minimis*." (*Id.* note 1.) Rather, its focus is the so-called "Termination Claim". (*Id.*)
    Kuo counters that the Company's glossing over the "Restoration Claim"–which Kuo terms the "denial of benefits claim"–is, in effect, the Company "conced[ing] that a reasonable jury could find that CA denied Kuo benefits due to him under the FMLA when following Kuo's leave, it restored him to a position that was inferior to his pre-leave position in terms of title, compensation and job security." (*See* Pl.'s Opp'n Mem. at 11.) In any event, it is Kuo's contention that in his case, his two claims of CA's violation of the FMLA are "inextricably connected". (*Id.*) These arguments will be more fully addressed in the "Discussion" section of this Memorandum & Order.

Plaintiff vigorously opposes granting summary judgment in Defendant's favor, arguing that (1) he has established a prima facie case of retaliation, and (2) he has presented sufficient evidence of pretext on the Company's part, such that a jury could conclude that the Company's articulated reason for its action is pretextual and that the real reason for its action was retaliation for Kuo's exercising his rights that are protected under the FMLA. For the reasons stated below, Defendant's Motion for Partial Summary Judgment is DENIED.

## I. BACKGROUND

The following facts are gleaned from the Parties' Rule 56.1 Statements and are undisputed unless otherwise noted.

Kuo is a computer software engineer who first worked for a company later acquired by CA and, after the acquisition in late 1996, then worked for CA. The Company terminated Kuo on May 4, 2005.

In the Fall of 2004, Kuo was a senior vice president with a development center (or unit) of CA, the so-called BrightStor storage brand unit. BrightStor consisted of data protection software products (including storage products) of which there were various versions or "releases". Kuo's unit generated more than $200 million in annual revenue for the Company.

As a senior vice president, Kuo had approximately 125 people reporting to him, earned a base salary of $200,000, and participated in the Company's incentive compensation plan with a success bonus target of $20,000 for 2004. One of Kuo's many duties as a senior vice president was hiring and terminating personnel.

Kuo's original supervisor was Frank Yang (Yang"), but in earlier September 2004, Yang

3

left the BrightStor unit to lead an architecture group (the "Architecture Group") that would focus on the development of BrightStor release 12 ("r12"). Christopher Broderick ("Broderick") replaced Yang as Kuo's direct supervisor.

Earlier in 2004, Kuo's wife gave birth to their son. In October 2004, when Kuo's wife was returning to full-time work, Kuo requested paternity leave under the FMLA to care for his infant son. His request was made to Broderick by e-mail. The two meet a day after Kuo sent his e-mail to discuss Kuo's leave and coverage of Kuo's duties during the leave. Kuo's and Broderick's recollection of the discussion diverges. According to Defendant, it was Kuo who "discussed with Broderick his long-term interests at CA" with Kuo explaining "he was looking for a position that was much more 'hands-on' and 'closer to the technology,' a position that required "less delegation of work and less supervision of other people." (Def.'s Mem. Supp. Mot. Partial Summ. J. ("Def.'s Summ. J. Mem.") at 5.) Conversely, Plaintiff recalls "Broderick expressed concern[s] about Kuo's impending absence because of the importance of Kuo's position and steered the conversation towards the prospect of permanently replacing Kuo . . . ." (Pl.'s Opp'n Mem. at 4.) Therefore, "Broderick asked Kuo what he was interested in doing in the next steps in his career." (*Id.*) While responding to Broderick's inquiry that he (Kuo) "would be interested in working on more strategic new products development" and "expressed an interest in working with Yang's Architecture Group on the development of r12," Kuo never told Broderick he was dissatisfied with his current position "or that he was looking for a new job." (*Id.*) Yet, after this discussion, there seemed to be an agreement that upon Kuo's return from leave, Kuo would work in Yang's group. (*Cf.* Def.'s Summ. J. Mem. at 5 ("After this conversation, Kuo understood that upon his return from leave, he would work under Yang in the

4

Architecture Group."), *with* Pl.'s Opp'n Mem. at 5 ("Based on Kuo's pre-leave communications with Broderick, Kuo understood that, upon his return from leave, he would work in Yang's group to define and help lead the r12 project.").) When Kuo went on leave on November 8, 2004, he was permanently replaced in the BrightStor group by Matthew Dickson ("Dickson").

However, it is unclear whether Kuo's group change would result in other changes for him. Defendant makes no mention of how the change in group would affect Kuo's rank, compensation and other benefits. On the other hand, Kuo propounds that "[a]t no time prior to . . . going out on leave . . . did anyone from CA even suggest to Kuo any reduction in his title or compensation." (Pl.'s Opp'n Mem. at 5.) Indeed, "Kuo would not have agreed, and did not agree, to such a reduction in connection with leaving the [BrightStor group] and working with the r12 Architecture Group." (*Id.*) Rather, "based on numerous communications from CA, Kuo believed that his title and compensation in his post-leave position would be equivalent to his pre-leave position." (*Id.*)

With the Company's approval, Kuo extended his original eight-week leave to the maximum twelve-week leave allowed under the FMLA. Thus, he returned to the Company on January 31, 2005, and, upon his return, began working with Yang as a member of the r12 Architecture Group. Kuo also avers that upon his return, "he made repeated attempts to meet with Broderick to have a substantive discussion about his new role, but Broderick was not available." (Pl.'s Opp'n Mem. at 6.) It was not until February 14, 2005, that Broderick advised Kuo that his title would be changed from "Senior Vice President" to "Vice President" and that he

would no longer be eligible to participate in the Company's incentive compensation plan;[2] however, Kuo's base compensation level would remain unchanged at $200,000 per year. The Parties do not dispute that Kuo did not complain about this change. (*Cf.* Def.'s Summ. J. Mem. at 8 ("[A]t no time during his tenure at CA did Kuo complain to Yang, Broderick, or anyone else about this change in his title and incentive compensation."), *with* Pl.'s Opp'n Mem. at 7 ("Kuo was extremely surprised and disappointed upon learning about the demotion, *but he did not complain about it* because he was concerned about potential retaliation if he pressed the issue. Kuo also hoped that he could eventually convince CA to reverse the demotion." (Citations and footnote omitted; emphasis added)).) The Company maintains that Kuo's new position warranted these reductions because it "had significantly less responsibility than his prior role." (Def.'s Summ. J. Mem. at 8.) Kuo opposes this assertion, stating he " believed that r12 was going to be an important project for the future of the BrightStor business," and therefore, he "reasonably believed that helping to lead such a strategically significant group was an appropriate role for someone with his background and that the position would enhance his career at CA." (Pl.'s Opp'n Mem. at 6.) In other words, Kuo avers that his changed position did not warrant the reductions he endured.

In late December 2004, the initial work on CA's 2006 fiscal year began with Phoebe Hsu ("Hsu"), Broderick's business operations manager, gathering information for the process. For his part, Yang submitted a proposed budget for the Architecture Group in January 2005. Yang's budget was not approved in January or February 2005. Instead, during that time, Hsu "reviewed

---

[2] Apparently, earlier, "[o]n February 11, 2005, *Yang* told Kuo that he had learned from Broderick that Kuo's title and possibly his compensation would be reduced." (Pl.'s Opp'n Mem. at 6.)

development plans for BrightStor, and analyzed the focus of BrightStor in an effort to determine budget requirements." (Def.'s Summ. J. Mem. at 6.) "Hsu developed plans for three possible budgetary scenarios as compared to the 2005 fiscal year: an increase in the BrightStor development budget (Plan A); the same amount of funding (Plan B); and a decrease in the BirghtStor development budget (Plan C)." (*Id.* at 6-7.) Kuo maintains that there were indications as early as January 2005 that the r12 project of the Architecture Group was in jeopardy of being eliminated, to wit (1) the non-approval of the Architecture Group's budget, (2) the indefinite postponement of an r12 "kickoff" meeting, originally scheduled for February 2005, and (3) the non-occurrence of a planned presentation to the Company's CEO concerning r12.

On March 11, 2005, Broderick was informed by Russ Artzt, Executive Vice President in charge of development of all CA products, that funding for BrightStor development would be reduced by approximately $8 million for the 2006 fiscal year, beginning April 1, 2005. As a result, a decision was made to reduce the work force (the so-called "reduction in force" or "RIF") and to cancel certain development projects, including the r12 project. Broderick prepared a RIF proposal that was approved by Human Resources Vice President Greg Meadows ("Meadows"). Thus, according to the approved RIF plan, *inter alia*, Yang's Architecture Group was eliminated and seven of the fifteen-member Architecture Group–including Yang and Kuo–were terminated in May 2005. Kuo's replacement in the BrightStor unit, Dickson, was not terminated under the RIF plan; he remains employed by the Company.

Kuo claims that at the time of his termination, there were other available positions within the Company for which he was qualified. There is no evidence, however, that Kuo applied for any of these positions.

7

After his termination, Kuo contacted Meadows, complaining that (1) his reduction in title and compensation when he transferred to the Architecture Group and (2) his termination were in violation of the FMLA. The record indicates that Kuo lodged his complaint via e-mail; he did not speak with Meadows on this issue. Having learned of the complaint, Meadows investigated said complaint by first having a conversation with Broderick and then instructing Broderick to submit a "written narrative of the situation surrounding Mr. Kuo." (Meadows Dep. at 62:22-23, attached as Ex. 2 to Mintzer Affirm. (doc. #22).) Thereafter, Meadows e-mailed a reply to Kuo providing an outline of events (presumably based on Broderick's recollections, although the e-mail does not indicate the basis for the summary of events) and concluding, "Based upon these facts, I see nothing that suggests that any of the decisions impacting your employment were in any way influenced by your decision to take an FMLA leave of absence." (E-mail from Gregory Meadows, <Gregory.Meadows@ca.com>, to Chin Kuo, <konakuo@yahoo.com> (May 23, 2005) (Ex. Y, attached to Def.'s Not. of Mot. (doc. #17)).)

Kuo was unemployed for eight months. He accepted a new position as a "director of productization" at FalconStor Software in December 2005. Kuo's initial base salary was $87,500.

## II. DISCUSSION

### A. *Standard for Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's

8

entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-moving party, that no rational jury could find in favor of the non-moving party. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, and/or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange, N.Y.*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson*

9

*v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Id.* (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the court in its determination of the summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will ultimately bear the burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence supporting an essential element of the non-movant's claim. *See id.* at 210-11. In such an instance, in order to defend against the motion for summary judge, the non-movant must offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). And, in deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

At its core, the Court's function in deciding a motion for summary judgment is "issue finding," not "issue resolution." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). In that regard, the Second Circuit has instructed, "Our role is not to weigh the evidence or make determinations of credibility but to 'determine whether there is a genuine issue for trial.'" *Vill. of Kiryas Joel Local Dev. Corp. v. Ins. Co. of N. Am.*, 996 F.2d 1390, 1392 (2d Cir. 1993) (quoting *Anderson*, 477 U.S. at 249).

### B. Establishing a Prima Facie Case of Retaliation under the FMLA

In recent years, the Second Circuit has articulated the proper analysis to be applied to an FMLA retaliation claim, *i.e.*, the burden-shifting framework established by the Supreme Court in *McDonnell-Douglas*. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir.), *aff'd in part by*, 95 Fed. Appx. 390 (2d Cir. 2004);[3] *see also Stevens v. Coach U.S.A.*, 386 F. Supp. 2d 55, 61 (D. Conn. 2005). Thus, a plaintiff must first make out a prima facie case of retaliation which requires a plaintiff to

> establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

*Potensa*, 365 F.3d at 168. If a plaintiff is successful in meeting this initial burden,

---

[3] The Court parenthetically notes that the Second Circuit declined to articulate the analysis it believes should be applied in cases asserting interference with the exercise of rights given by the FMLA. *See Potenza*, 365 F.3d at 168 ("Because [plaintiff's] case involves retaliation rather than interference, we need not decide whether or not to adopt the Seventh Circuit's analysis [*i.e.*, using the *McDonnell-Douglas* burden-shifting analysis for claims of retaliation, but not for claims asserting interference with exercising rights under the FMLA] in its entirety."); *see, e.g., King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).

> the burden [then] shifts to the defendant to state a legitimate non-
> discriminatory reason for its action. If the defendant provides such
> a reason, the burden shifts back to the plaintiff to provide evidence
> from which a jury could conclude that the defendant's articulated
> reason for its action is pretextual and that the real reason for its
> action was retaliation for plaintiff's exercise of rights protected
> under the FMLA.

*Stevens*, 386 F. Supp. 2d at 61 (citing *McDonnell-Douglas*, 411 U.S. at 802-03; *Worster v. Carlson Wagon Lit Travel, Inc.*, 353 F. Supp. 2d 257, 270 (D. Conn. 2005)). However, "[o]rdinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) (further citation omitted).

### C. The Instant Case

#### 1. Plaintiff's Prima Facie Case

The Court disagrees with the Company's position that Kuo cannot make out a prima facie case. "Generally speaking, a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is minimal." *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (internal quotation marks and citations omitted); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (same); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) ("A plaintiff's burden of establishing a *prima facie* case is *de minimis*. The requirement is neither onerous, nor intended to be rigid, mechanized or ritualistic.") (citations and internal quotation marks omitted).

(a) <u>The first three elements</u>

Here, as to the first element – exercising one's right protected under the FMLA–there is no dispute that Kuo did exercise his right to paternity leave as protected under the FMLA. Thus, the first element of Plaintiff's prima facie case is satisfied. Nor is there any argument that Kuo was qualified for the position that he held prior to his leave or that he was also qualified for the position he assumed upon his return to CA; hence, the second requisite element is established. Likewise, the parties do not dispute that Kuo was demoted[4] and terminated from the Company, adverse employment actions. Therefore, Kuo has satisfied the third element required to make his prima facie case.

(b) <u>The fourth element</u>

The parties' dispute centers on the fourth element, namely whether Kuo's termination by CA gives rise to an inference of retaliatory intent. This is sometimes referred to as the "causal connection" prong of a plaintiff's prima facie case. Predictably, Kuo avers that his termination does give rise to such retaliatory intent while the Company protests such a conclusion arguing, inter alia, that the gap between the time Plaintiff returned to work and his discharge is fatal to the fourth element of his prima facie case. Defendant cites *Potenza* in supporting its argument that Kuo cannot meet his "causal connection" burden. (*See* Def.'s Summ. J. Mem. at 15-16; Def.'s Reply Mem. at 4 (citing *Potenza*, 365 F.3d at 168; further citation omitted).) The Court is unpersuaded by Defendant's argument.

In *Potenza*, while noting the district court did not know the standard that the Second

---

[4] Although the circumstances surrounding his demotion are disputed, the parties do not dispute that Kuo's title and incentive compensation were changed.

Circuit would eventually require in bringing an FMLA retaliation claim, the Circuit Court was satisfied with the district court's implicit application of the four-element prima facie test. *See* 365 F.3d at 168. While the Circuit Court ultimately concluded, after its own "independent evaluation of the record," that an "indicia of retaliatory intent was lacking," of importance to this case is the Second Circuit's statement that, "[t]he fact that a two month delay intervened between Potenza's return to work and his removal as port engineer *does not completely vitiate his claim, as the district court could be read as suggesting.*" *Id.* (citing *Potenza v. City of New York*, No. 00 Civ. 0707 (SHS), 2001 WL 1267172, at *9 (S.D.N.Y. Oct. 23, 2001), *aff'd*, 365 F.3d 165 (2d Cir.), *aff'd in part by*, 95 Fed. Appx. 390 (2d Cir. 2004)) (emphasis added). Thus, contrary to the theory of the case the Company advances, the Court cannot disregard out of hand Kuo's temporal argument supporting a causal connection based on *Potenza*. Similarly unavailing is the Company's reliance on *O'Reilly v. Consol. Edison Co. of New York, Inc.*, 173 Fed. Appx. 20 (2d Cir. 2006). In *O'Reilly*, which parenthetically is a summary order and thus not entitled to precedential effect, the Court concluded that the three month gap between O'Reilly's FMLA leave and her termination was not sufficient to give rise to an inference of retaliation "in light of the additional leave time Con Ed's policy allowed." *Id.* at 22. That predicate for the holding in *O'Reilly*, viz. unused leave time, is absent here thus rendering the case largely irrelevant for present purposes.

In the Second Circuit, a Plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by "showing that the protected activity was closely followed in time by the adverse [employment] action." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and quotation marks omitted) (stating that twelve days

14

between alleged sexual harassment and discharge could suggest a causal relationship). Though there is no bright-line rule, an adverse employment action following within a couple months of the protected activity typically suffices to establish causal connection. *See Cioffi v. Averill Park Cent. School Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment.") (collecting cases); *Gormon-Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 555 (2d Cir. 2001) (passage of up to five months short enough for causal connection); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month period between filing of EEOC complaint and retaliating action sufficient to suggest causal relationship).

Just short of seven months separated the start of Kuo's paternity leave on November 8, 2004, and his discharge on May 4, 2005. The corresponding figure, if measured from his return to work on January 31, 2005, is slightly over three months. And the period is obviously less if Kuo's demotion and diminution of potential compensation in February 2005, mark, as I believe they should, the commencement of the Company's purported retaliatory conduct. Under the circumstances, the gap is sufficiently small to give rise to an inference of retaliation, thereby satisfying the fourth element of Kuo's prima facie case. Moreover, even if the span is deemed to be closer to seven months, the same result follows.

Given that Kuo has made out a prima facie case of retaliation, the burden shifts to Defendant.

2. Defendant's Burden to State Legitimate Non-Discriminatory Reasons

The Company asserts that, "even if Kuo was able to establish a prima facie case, CA had a legitimate, non-discriminatory reason for its actions: it terminated Kuo as part of an eight million dollar RIF." (Def.'s Summ. J. Mem. at 16 (citations omitted).) And, with respect to Kuo's demotion and potential loss of pay, the company explains that "[o]n February 14, 2005 Broderick advised Kuo that because his new role has significantly less responsibility than his prior role, [his] title would be changed from Senior Vice-President to Vice-President and his incentive compensation plan would be eliminated."). The reasons advanced satisfy the Company's burden of articulating non-discriminatory reasons for its actions. Therefore, the presumption raised by Kuo's prima facie case is rebutted and the burden shifts back to Kuo. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

3.  Plaintiff's Ultimate Burden

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). Accordingly, a Plaintiff who clears the prima facie hurdle may be able to defeat a motion for summary judgment. Here, Plaintiff's case (although weak particularly as to his discharge claim), is sufficient for that purpose. Among the issues for a jury to decide are the circumstances surrounding the Company's decision to demote Kuo and decrease his pay in February 2005. Was that done in retaliation for Plaintiff exercising his rights under FMLA or was it due to the claimed diminished responsibilities associated with his new position? If it was the latter, why was Kuo apparently kept in the dark about the concomitant adverse consequences until after he agreed to the transfer? Another question is whether the sole reason Kuo was

16

terminated was because he was a member of the r12 project. These, and some other questions, need to be answered by a jury after weighing all the evidence and determining the credibility of the witnesses.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment is DENIED.

The parties shall appear before the Court on Thursday, November 1, 2007 at 11:00 a.m. at the Federal Courthouse in Central Islip, New York, in Courtroom 930, for a pre-trial conference. Should that conference not result in a settlement, the case shall be scheduled for trial shortly thereafter.

**SO ORDERED**.
Dated: Central Islip, New York　　　　　　　　　　　/s/
　　　　September 27, 2007　　　　　　　　　　Denis R. Hurley,
　　　　　　　　　　　　　　　　　　　　　　　United States Senior District Judge